2012 COA 40

The PEOPLE of the State of Colorado, Plaintiff–Appellee,

v.

Todd George VECELLIO, Defendant–Appellant.

No. 10CA0383.

Colorado Court of Appeals, Div. VI.

March 15, 2012.

---

John W. Suthers, Attorney General, Majid Yazdi, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

McClintock & McClintock, P.C., Elizabeth A. McClintock, Theodore P. McClintock, Colorado Springs, Colorado, for Defendant–Appellant.

Opinion by Judge LOEB.

¶ 1 Defendant, Todd George Vecellio, appeals the judgment of conviction entered on jury verdicts finding him guilty of conspiracy to commit sexual assault on a child by one in a position of trust; solicitation to commit sexual assault on a child by one in a position of trust; criminal attempt to commit sexual assault on a child; and enticement of a child. We affirm.

## I. Background

¶ 2 On August 19, 2008, defendant contacted "Karina" in an Internet chat room through a website called "Adult Friend Finder," which allowed registered users to post profiles that contained their biographical information and sexual interests and contact other users through e-mail or by instant message. According to her profile, Karina was a thirty-one-year-old single mother with a thirteen-year-old daughter, "Shayla." In actuality, Karina was an undercover police officer conducting internet investigations as part of the Internet Crimes Against Children (ICAC) task force. Shayla did not exist.

¶ 3 During an initial instant message conversation, defendant learned from Karina that she and her thirteen-year-old daughter were engaged in an incestuous relationship and that she was looking for a male to "teach" her daughter about sex by having three-way intercourse with them. Defendant responded that he was interested in having sex with both Karina and Shayla, and he asked Karina several questions about her and Shayla's sexual experiences together, often remarking that Karina's answers made him sexually excited. However, defendant also regularly expressed concerns that Karina was a "cop" and sought assurances from her that she was not.

¶ 4 Defendant and Karina had many instant message conversations over several weeks. During these conversations, defendant routinely asked Karina about her and Shayla's sexual activities together and expressed interest in meeting them in person. Defendant also asked Karina whether she was interested in his taking pictures of their future sexual encounter and whether he should wear a condom. They also exchanged photos. Karina sent defendant a photo of herself (in actuality, a photo of the undercover police officer) and Shayla (in actuality, a school-age photo of a different female police officer). Defendant sent Karina a photo of his erect penis. Eventually, they exchanged phone numbers, and the undercover police officer researched defendant's phone number and discovered that it belonged to Todd Vecellio of Colorado Springs. The officer also

learned that Vecellio was a police officer for the University of Colorado at Colorado Springs (UCCS).

¶ 5 Eventually, defendant and Karina had several phone conversations over a few days. During these conversations, they made plans to meet at a convenience store in Penrose. They agreed that once they met and got "comfortable" with each other, they would go to Karina's house and have three-way sex with Shayla. They also agreed that defendant would purchase condoms before making the trip.

¶ 6 On September 24, 2008, defendant drove from Colorado Springs to the convenience store in Penrose. Once defendant arrived there, Karina called defendant and asked him to buy beer from the nearby liquor store. Defendant agreed to buy beer. Upon exiting the liquor store, however, defendant was arrested by police officers from the Cañon City Police Department and Fremont County Sheriff's Office. When he was arrested, officers found a box of condoms in defendant's pocket.

¶ 7 In connection with these events, defendant was charged with four counts: (1) conspiracy to commit sexual assault on a child by one in a position of trust; (2) solicitation to commit sexual assault on a child by one in a position of trust; (3) criminal attempt to commit sexual assault on a child; and (4) enticement of a child.

¶ 8 Defendant's theory of defense was that he was conducting his own secret undercover investigation into Karina and the possible abuse of her daughter, and defendant testified consistently with that theory at trial. According to defendant's testimony, he had been passed over for promotion several times while working as a police officer at UCCS and felt that conducting the investigation would give him a "chance to shine." As such, defendant stated that he did not drive to Penrose to have sex with Karina and Shayla; rather, he claimed he drove to Penrose to gather information about Karina so he could notify the authorities, save Shayla, and "be a hero." However, defendant also testified that he had never conducted an ICAC investigation, had never been trained in conducting an ICAC investigation, did not save the

instant message conversations with Karina, did not record the telephone calls with Karina, and did not inform anyone, including his supervisor, of his secret undercover operation, nor did he obtain authorization to conduct the operation. The jury convicted defendant on all counts.

¶ 9 This appeal followed.

## II. Conspiracy

¶ 10 Defendant contends that the evidence was insufficient to convict him of conspiracy to commit sexual assault on a child by one in a position of trust. Specifically, he contends that, in Colorado, the crime of conspiracy requires a real agreement between two true co-conspirators. Accordingly, because Karina was in actuality an undercover police officer who never intended to engage in any criminal activity, defendant contends that he never entered into an agreement with a true co-conspirator, and, thus, the evidence was insufficient to convict him of conspiracy.

¶ 11 On this issue of first impression, we conclude that Colorado's conspiracy statute reflects the "unilateral" approach to conspiracy, under which a defendant may be convicted of conspiracy by agreeing with another party to commit a crime, regardless of whether the other party is an undercover police officer who feigns agreement. Therefore, because the fact that defendant agreed to commit a crime with an undercover police officer does not preclude his conviction, and because the evidence was sufficient to support his conviction, we reject defendant's contention.

## A. Standard of Review

¶ 12 When reviewing a sufficiency of the evidence contention, a court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *People v. Sprouse*, 983 P.2d 771, 777 (Colo.1999); *People v. McIntier*, 134 P.3d 467, 471 (Colo.App. 2005). The prosecution must be given the benefit of every reasonable inference that

might be fairly drawn from the evidence. *McIntier,* 134 P.3d at 471.

¶ 13 Here, defendant's sufficiency of the evidence contention turns on a question of statutory interpretation. Statutory interpretation is a question of law that we review de novo. *Bostelman v. People,* 162 P.3d 686, 689 (Colo.2007).

¶ 14 When interpreting a statute, we must give effect to the intent of the General Assembly, which is vested with the power to define criminal conduct and to establish the legal components of criminal liability. *People v. Hoskay,* 87 P.3d 194, 197–98 (Colo.App. 2003). To determine the General Assembly's intent, we look first to the language of the statute itself, giving words and phrases their plain and ordinary meaning. *People v. Rice,* 198 P.3d 1241, 1244 (Colo.App.2008). We read words and phrases in context and construe them according to their common usage. *Id.* "[W]e must read and consider the statutory scheme as a whole to give consistent, harmonious and sensible effect to all its parts." *People v. Luther,* 58 P.3d 1013, 1015 (Colo.2002) (quoting *Charnes v. Boom,* 766 P.2d 665, 667 (Colo.1988)). If the statutory language is clear and unambiguous, we do not engage in further statutory analysis and apply the statute as written. *Bostelman,* 162 P.3d at 690; *People v. Witek,* 97 P.3d 240, 243 (Colo.App.2004).

### B. Analysis

¶ 15 Defendant's argument raises an issue of first impression in Colorado, namely, whether Colorado's conspiracy statute adopts the bilateral or unilateral approach to conspiracy. *See Marquiz v. People,* 726 P.2d 1105, 1108 n. 6 (Colo.1986) (declining to decide as unnecessary to the resolution of the case whether the conspiracy statute adopts the unilateral approach and noting that the issue had never been presented to the court directly).

¶ 16 On appeal, defendant asks us to adopt the "bilateral" approach to conspiracy applied in the federal courts, as enunciated in

1. We note that the federal conspiracy statute, 18 U.S.C. § 371 (2006), under which *Barboa* was decided, beginning with the words, "If two or

*United States v. Barboa,* 777 F.2d 1420 (10th Cir.1985). Under the bilateral approach, the crime of conspiracy is committed when at least two true co-conspirators agree to proceed in a prohibited manner.[1] *See State v. Rambousek,* 479 N.W.2d 832, 833–34 (N.D. 1992). Accordingly, under the bilateral approach, a defendant cannot be convicted of conspiracy when the other party feigns agreement, such as in cases involving undercover government agents, because two true co-conspirators have not agreed to commit a crime. *See Barboa,* 777 F.2d at 1422 ("[T]here can be no indictable conspiracy involving only the defendant and government agents ....").

¶ 17 However, as defendant concedes on appeal, state courts have rejected the bilateral approach in favor of a "unilateral" approach. *See, e.g., State v. John,* 213 Neb. 76, 328 N.W.2d 181, 191 (1982); *Rambousek,* 479 N.W.2d at 835–36; *Miller v. State,* 955 P.2d 892, 897 (Wyo.1998) (the modern trend in state courts is to rule that a conspiracy count is viable even when one of the participants is a government agent or is feigning agreement). Under the unilateral approach, the crime of conspiracy is committed when the defendant agrees with another person to act in a prohibited manner; the second party can feign agreement. *State v. Heitman,* 262 Neb. 185, 629 N.W.2d 542, 553 (2001). Accordingly, because the unilateral approach requires only that the defendant agree to proceed in a prohibited manner, the fact that the other party is an undercover police officer is irrelevant. *Id.* For the reasons that follow, we conclude that Colorado's conspiracy statute adopts the unilateral approach.

¶ 18 The text of Colorado's conspiracy statute suggests that the General Assembly intended to adopt the unilateral approach. Colorado's conspiracy statute provides, in pertinent part:

> *A person commits conspiracy to commit a crime if,* with the intent to promote or facilitate its commission, *he agrees* with another person or persons that they, or one or more of them, will engage in con-

more persons conspire ...," is clearly a bilateral approach, as discussed more fully below.

duct which constitutes a crime or an attempt to commit a crime, or he agrees to aid the other person or persons in the planning or commission of a crime or of an attempt to commit such crime.

§ 18–2–201(1), C.R.S.2011 (emphasis added). By its plain terms, the statute defines conspiracy as the actions of a single actor agreeing with another, rather than as an agreement between two or more persons. *Id.;* Wayne R. LaFave, *Substantive Criminal Law* § 12.2(a), at 268 n. 30 (2003) (stating that Colorado's statute, along with most states' modern criminal codes, defines conspiracy in terms of a single actor agreeing with another). Accordingly, the plain language of the statute suggests that a defendant can be guilty of conspiracy if "he [or she] agrees" with another person to commit a crime, regardless of whether the other person feigns agreement with the defendant. *See* § 18–2–201(1); *Rice,* 198 P.3d at 1244. Thus, by its plain terms, the conspiracy statute's focus on a single actor, rather than on two or more actors coming to an agreement, evinces a legislative intent to adopt the unilateral approach.

¶ 19 Moreover, a comparison of Colorado's previous and current conspiracy statutes, as well as the conspiracy provision found in the Model Penal Code (MPC), demonstrates that the General Assembly intended to adopt the MPC's unilateral approach to conspiracy when it revised the conspiracy statute in 1971. Before its revision in 1971, the conspiracy statute read:

> If *any two or more persons* shall conspire or agree, falsely and maliciously, to charge or indict, or be informed against, or cause to procure to be charged or indicted or informed against any person for any criminal offense, or shall agree, conspire or cooperate to, or to aid in doing any other unlawful act, each of the persons so offending shall on conviction, in case of a conspiracy to commit a felony, be confined in the penitentiary for a period of not less than one year, nor more than ten years....

§ 40–7–35, C.R.S.1963 (emphasis added). This statute was "unequivocally of the bilateral variety" because it required that "two or more persons ... agree, conspire or cooper-

ate." Marianne Wesson, *Mens Rea and the Colorado Criminal Code,* 52 U. Colo. L.Rev. 167, 206 (1981); *see also Archuleta v. People,* 149 Colo. 206, 212, 368 P.2d 422, 425 (1962) ("In order to be convicted of a conspiracy there must be evidence that two or more conspired to do an unlawful act.... [Defendant] could not conspire with himself.").

¶ 20 In 1971, the General Assembly enacted a complete revision of the Colorado Criminal Code (the Code), which drew heavily from the recently drafted MPC. *People v. Vigil,* 127 P.3d 916, 931 (Colo.2006). The MPC, like the later version of the Colorado statute, defines conspiracy in the context of a single actor agreeing with another. *See* Model Penal Code § 5.03(1)(a) ("A person is guilty of conspiracy with another person or persons to commit a crime if with the purpose of promoting or facilitating its commission he... agrees with such other person ...."); *see also* Wesson, at 206. Moreover, the commentaries to the MPC expressly state that the MPC's conspiracy provision reflects the unilateral approach:

> Subsection (1) departs from the traditional view of conspiracy as an entirely bilateral or multilateral relationship, the view inherent in the standard formulation cast in terms of "two or more persons" agreeing or combining to commit a crime. Attention is directed instead to each individual's culpability by framing the definition in terms of the conduct that suffices to establish the liability of any given actor, rather than the conduct of a group of which he is charged to be a part. This approach has been designated "unilateral," and it has apparently been followed in all but a few of the recently revised codes....

Model Penal Code and Commentaries § 5.03 cmt. 2(b), at 398–99 (1985). The General Assembly's adoption of the MPC's definition of conspiracy further demonstrates that Colorado's definition of conspiracy reflects the unilateral approach.

¶ 21 Other state courts, interpreting nearly identical statutory language, have come to the same conclusion we reach here. In *Miller v. State,* the Wyoming Supreme Court concluded that Wyoming's conspiracy statute adopted the unilateral approach, noting that

it was adopted in part from the MPC. *Miller*, 955 P.2d at 897. Further, the court also stated that its "research discloses that most states that have adopted this second definition of the crime of conspiracy [with the focus on a single actor agreeing with another] have embraced a unilateral approach to conspiracy." *Id.*

¶ 22 Similarly, in *State v. John*, the Nebraska Supreme Court concluded that Nebraska's conspiracy statute reflected the unilateral approach because it contained similar language to the MPC, with a focus on a single actor agreeing with another rather than on two or more persons agreeing. *John*, 328 N.W.2d at 190–91. The Nebraska Supreme Court later applied the rule in *John* to uphold a defendant's conviction for conspiracy where he, like defendant in this case, agreed over the internet to have sex with an undercover police officer posing as an underage girl. *Heitman*, 629 N.W.2d at 553.

¶ 23 We are persuaded by the reasoning in these cases and find it applicable here. A person who believes he or she is conspiring with another to commit a crime is a danger to the public regardless of whether the other person has in fact agreed to commit the crime. *See Miller*, 955 P.2d at 897. The unilateral approach is justified, in part, because a person plotting a crime with a feigning accomplice has a guilty mind. *Id.*[2]

¶ 24 Thus, we conclude that Colorado's conspiracy statute reflects the unilateral approach to conspiracy. Accordingly, the fact that defendant's agreement was made with an undercover police officer does not, as a matter of law, preclude his conviction for conspiracy.

### C. Application

¶ 25 Given our interpretation of the conspiracy statute above, we now turn to whether the evidence was sufficient to support defendant's conviction for conspiracy to commit sexual assault on a child by one in a position of trust. We conclude that it was.

¶ 26 "The crime of conspiracy is the illegal agreement to commit a crime coupled with at least one overt act in furtherance of that agreement." *People v. Phong Le*, 74 P.3d 431, 435–36 (Colo.App.2003); *see also* § 18–2–201(1)–(2), C.R.S.2011.

¶ 27 The evidence at trial, when taken as a whole and viewed in the light most favorable to the prosecution, was sufficient to support defendant's conviction of conspiracy to commit sexual assault on a child by one in a position of trust. The record is clear and shows that, during several conversations conducted via instant message and over the phone, defendant explicitly agreed with Karina to commit sexual assault on her thirteen-year-old daughter. The record also shows that defendant committed overt acts in furtherance of the conspiracy, specifically, his driving to Penrose to meet Karina and Shayla and his purchase of condoms and beer. *See* § 18–2–201(2).

¶ 28 Accordingly, we conclude that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt on the conspiracy charge. *See Sprouse*, 983 P.2d at 777.

### III. Jury Instruction on Complicity

¶ 29 Defendant next contends that the trial court reversibly erred by instructing the jury on the legal theory of complicity because the prosecutor did not allege or prove that another individual, besides defendant, committed any crime. We perceive no plain error requiring reversal of the conviction.

### A. Standard of Review and Applicable Law

¶ 30 We review jury instructions de novo to determine whether the instructions as a whole accurately informed the jury of the governing law. *People v. Lucas*, 232 P.3d 155, 162 (Colo.App.2009). However, the trial court has substantial discretion in formulating the jury instructions so long as they

---

**2.** Moreover, as recognized by another division of this court, and as the circumstances here demonstrate, internet sting operations of the type used here are a necessary and important modern law enforcement tool: "They are relatively inexpensive and easy to do, lack substantial risk to law enforcement personnel, and are directed at very serious offenses with respect to which there is considerable public concern." *People v. Grizzle*, 140 P.3d 224, 227 (Colo.App.2006).

are correct statements of the law and fairly and adequately cover the issues presented. *People v. Pahl*, 169 P.3d 169, 183 (Colo.App. 2006).

¶ 31 At the outset, we reject defendant's contention that he objected to the jury instruction at issue. Rather, defense counsel affirmatively stated that he had no objections to any of the instructions. At trial, defendant objected to the trial court's response to a juror question regarding the elemental instruction on the enticement charge on the ground that the court's response unduly emphasized the complicity instruction. However, on appeal, defendant does not contend that the court's response to the juror question constituted error; rather, he contends that the court's giving the complicity instruction in the first instance was error. We do not view defendant's objection to the court's response to the jury's question as preserving an objection to the complicity instruction itself. Further, we reject defendant's contention that the alleged instructional error here constituted structural error warranting a new trial. *See Griego v. People*, 19 P.3d 1, 8 (Colo.2001) (instructional error not subject to structural error analysis). Therefore, because defendant did not object to the jury instructions at trial, we review his contention on appeal for plain error. *See People v. Boykins*, 140 P.3d 87, 95 (Colo.App.2005).

¶ 32 Plain error is error that is both "obvious and substantial." *People v. Miller*, 113 P.3d 743, 750 (Colo.2005). It is an error that "so undermined the fundamental fairness of the proceeding as to cast serious doubt on the reliability of the judgment." *People v. Sepulveda*, 65 P.3d 1002, 1006 (Colo.2003). To warrant reversal under a plain error standard in the context of jury instructions, the defendant must "demonstrate not only that the instruction affected a substantial right, but also that the record reveals a reasonable possibility that the error contributed to his conviction." *People v. Garcia*, 28 P.3d 340, 344 (Colo.2001) (quoting *Bogdanov v. People*, 941 P.2d 247, 255–56 (Colo.1997)). An erroneous jury instruction does not normally constitute plain error where the issue is not contested at trial or the record contains overwhelming evidence

of the defendant's guilt. *People v. Zamarripa–Diaz*, 187 P.3d 1120, 1122 (Colo.App. 2008).

¶ 33 Complicity is not a separate and distinct crime or offense. *Grissom v. People*, 115 P.3d 1280, 1283 (Colo.2005). Rather, it is "a theory by which a defendant becomes accountable for a criminal offense committed by another." *Id.* (quoting *People v. Thompson*, 655 P.2d 416, 418 (Colo.1982)). Colorado's complicity statute provides:

A person is legally accountable as principal for the behavior of another constituting a criminal offense if, with the intent to promote or facilitate the commission of the offense, he or she aids, abets, advises, or encourages the other person in planning or committing the offense.

§ 18–1–603, C.R.S.2011.

## B. Analysis

¶ 34 Here, the trial court gave the following instruction to the jury regarding complicity:

A person is guilty of an offense committed by another person if he is a complicitor. To be guilty as a complicitor, the following must be established beyond a reasonable doubt:

1. A crime must have been committed.

2. Another person must have committed all or part of the crime.

3. The defendant must have had knowledge that the other person intended to commit all or part of the crime.

4. The defendant did intentionally aid, abet, advise, or encourage the other person in the commission or planning of the crime.

¶ 35 As noted above, defendant did not object to this instruction at trial, nor is there any dispute that the language of the instruction was a correct statement of the law. On appeal, however, defendant contends that the court erred in giving the instruction in the first instance because Karina was an undercover police officer who did not commit any crime. That is, defendant contends that it was improper for the trial court to give the complicity instruction because "[t]here was

no principal actor responsible for an actual crime for which [defendant] could be complicit."

¶ 36 For purposes of our analysis, assuming, without deciding, that the court erred in giving the complicity instruction, we conclude that any such error did not constitute plain error.

¶ 37 In reaching that conclusion, we first consider how, if at all, each of the four offenses for which defendant was found guilty is pertinent to defendant's contention regarding the complicity instruction, and whether the alleged error in instructing the jury on complicity constituted plain error requiring reversal of the convictions on any of those offenses.

¶ 38 At oral argument, and to a lesser extent in his briefs on appeal, defendant contended generally that the alleged error in giving the complicity instruction required reversal of his convictions on all four offenses. However, the substance of his argument appears to be focused most specifically on his conviction for enticement. The offense of enticement of a child is defined in relevant part as follows:

A person commits the crime of enticement of a child if he or she invites or persuades, or attempts to invite or persuade, a child under the age of fifteen years to enter any vehicle, building, room, or secluded place with the intent to commit sexual assault or unlawful sexual contact upon said child.

§ 18–3–305(1), C.R.S.2011.

¶ 39 During closing argument, the prosecutor argued that the jury could find defendant guilty of enticement under two theories, neither of which required the jury to find defendant guilty as a complicitor. First, the prosecutor argued that the jury could convict defendant of enticement because, during a phone conversation with Karina, he attempted to invite or persuade Karina and Shayla to enter his car. See § 18–3–305(1) ("It is not necessary to a prosecution for attempt under this subsection (1) that the child have perceived the defendant's act of enticement."). Second, the prosecutor argued that the jury could convict defendant of enticement because he was using Karina as his agent to

invite or persuade Shayla to enter a secluded place. Accordingly, under either theory, the prosecutor argued that the jury could find defendant guilty of enticement as a principal actor without relying on a theory of complicity. Moreover, as discussed in further detail in Section IV below, there was sufficient evidence to convict defendant under either of these theories as a principal or under a complicitor theory of liability. Therefore, to the extent there was error here with respect to the charge of enticement, we conclude that any such error did not "so undermine[ ] the fundamental fairness of the proceeding as to cast serious doubt on the reliability of the judgment." *Sepulveda*, 65 P.3d at 1006.

¶ 40 Nor do we perceive any plain error with respect to defendant's convictions on the other three substantive offenses. Conspiracy, unlike complicity, is a substantive criminal offense, *see Palmer v. People*, 964 P.2d 524, 527–28 (Colo.1998), and, as discussed above, there was sufficient evidence to support defendant's conviction for conspiracy as a principal, without reliance on a complicity theory. *See People v. Dunaway*, 88 P.3d 619, 631 (Colo.2004); *People v. Sharp*, 104 P.3d 252, 257 (Colo.App.2004); *see also Trujillo v. Hartley*, 2010 WL 2692173, at *9 (D.Colo. No. 07–cv–02337–MSK, July 6, 2010) (unpublished opinion and order) (a defendant's convictions are constitutional if the evidence was sufficient to establish his guilt either as a principal or as a complicitor), *appeal dismissed*, 406 Fed. Appx. 280 (10th Cir.2010). Similarly, because defendant has not challenged the sufficiency of the evidence to support his convictions for solicitation to commit sexual assault on a child and criminal attempt to commit sexual assault on a child as a principal, we perceive no prejudice and thus, no plain error, with respect to his convictions on those two counts. *See Dunaway*, 88 P.3d at 631; *Trujillo*, 2010 WL 2692173, at *9.

¶ 41 As further support for our plain error analysis, we note that the trial court also instructed the jury as follows: "The prosecution is not required to prove that an actual child or an actual mother was involved in order to prove the crimes charged in this case." Defendant did not object to this in-

struction at trial, nor does he challenge it on appeal. Under these circumstances, we fail to see how defendant could have been prejudiced, where his only argument on appeal is that the court erred in giving the complicity instruction because the undercover officer was not "an actual mother" who could be a principal actor responsible for an actual crime.

## IV. Enticement

¶ 42 Defendant also contends that the evidence was insufficient to convict him of enticement of a child because no child was actually involved in this case and because he never communicated with anyone pretending to be a child. We disagree.

¶ 43 When reviewing a sufficiency of the evidence contention, a court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of guilt beyond a reasonable doubt. *Sprouse*, 983 P.2d at 777; *McIntier*, 134 P.3d at 471. The prosecution must be given the benefit of every reasonable inference that might be fairly drawn from the evidence. *McIntier*, 134 P.3d at 471.

¶ 44 A person commits the crime of enticement of a child if

he or she invites or persuades, or *attempts to invite or persuade*, a child under the age of fifteen years to enter any vehicle, building, room, or secluded place with the intent to commit sexual assault or unlawful sexual contact upon said child. *It is not necessary to a prosecution for attempt under this subsection (1) that the child have perceived the defendant's act of enticement.*

§ 18–3–305(1) (emphasis added). Accordingly, a defendant may be convicted of enticement if he or she "attempts to invite or persuade" a child under fifteen years of age to enter any secluded place, regardless of whether the child perceives the defendant's act of enticement. *Id.*

¶ 45 In *People v. Grizzle*, the defendant had been convicted of enticement by engaging in several sexually explicit internet and phone conversations with an undercover po-

lice officer posing as a thirteen-year-old girl. *Grizzle*, 140 P.3d at 225. In discussing whether the defendant could raise an entrapment defense, the division analyzed the enticement statute's "attempt" language in conjunction with the criminal attempt statute, noting that neither factual nor legal impossibility is a defense to attempt "if the offense could have been committed had the attendant circumstances been as the actor believed them to be." *Id.* at 226 (quoting § 18–2–101(1), C.R.S.2011). Accordingly, the division concluded that where no "real" victim is involved, a defendant could commit enticement provided he or she believed that the person with whom a sexual encounter had been arranged was under the age of fifteen. *Id.; see also United States v. Sims*, 428 F.3d 945, 959–60 (10th Cir.2005).

¶ 46 We find *Grizzle* persuasive and applicable here. Based on the statutory language found in both the enticement and criminal attempt statutes, we conclude, as did the division in *Grizzle*, that a defendant may be convicted of enticement regardless of whether the victim is "real," provided the defendant believed the victim was under fifteen years of age and the other statutory elements are met. *See Grizzle*, 140 P.3d at 226; *see also* § 18–3–305(1) ("[a] person commits the crime of enticement" if he or she "*attempts to invite or persuade*, a child under the age of fifteen years to enter any ... secluded place") (emphasis added); § 18–2–101(1) ("Factual or legal impossibility of committing the offense is not a defense if the offense could have been committed had the attendant circumstances been as the actor believed them to be...."). Further, under the terms of the enticement statute, the prosecution need not show that the child perceived the defendant's act of enticement. § 18–3–305(1). Accordingly, the fact that Shayla did not exist and that defendant never communicated with her directly does not preclude his conviction for enticement.

¶ 47 Given our interpretation of the enticement statute above, we now turn to whether the evidence was sufficient to uphold defendant's conviction for enticement. We conclude that the evidence was sufficient to uphold defendant's conviction under both of

the prosecutor's theories of liability: either directly as a principal actor, or as a complicitor.

¶ 48 First, the evidence at trial, when taken as a whole and viewed in the light most favorable to the prosecution, was sufficient to support defendant's conviction of enticement as a principal actor. The record shows that, during a recorded phone conversation, defendant attempted to invite or persuade Shayla to enter a secluded place with him (either his car or Karina's house) to commit sexual assault on her. The record also shows that defendant attempted to use Karina as his agent to invite or persuade Shayla on his behalf. Moreover, it was undisputed that defendant believed Shayla was thirteen years old while engaging in these conversations.

¶ 49 Second, the evidence was sufficient to uphold defendant's conviction as a complicitor. The record shows that defendant aided, advised, or encouraged Karina in planning the offense of enticement. Specifically, evidence at trial established that defendant aided Karina in committing the offense in several ways, including by purchasing condoms to help facilitate the sexual encounter; advising Karina in planning the offense, including by helping to plan the meeting at the convenience store in Penrose and the subsequent sexual liaison at Karina's house; and encouraging Karina in planning and committing the offense.

¶ 50 Accordingly, when reviewing the evidence as a whole and in the light most favorable to the prosecution, we conclude that the evidence was sufficient to support a finding of guilt beyond a reasonable doubt on the enticement charge under either of the prosecution's theories. *See Sprouse*, 983 P.2d at 777; *Dunaway*, 88 P.3d at 631; *Trujillo*, 2010 WL 2692173 at *9.

## V. Alleged Character Evidence

¶ 51 Defendant also contends that the trial court erred in permitting the prosecutor to ask defendant questions during cross-examination about his sexual interests, prior sex acts, and employment history because such evidence was inadmissible as improper character evidence under CRE 404(b). The Peo-

ple contend that the evidence did not implicate CRE 404(b) and was admissible because it was relevant and not unduly prejudicial. We agree with the People.

### A. Standard of Review

¶ 52 Trial courts have considerable discretion concerning the admissibility of evidence and the determination of its relevancy, probative value, and prejudicial effect. *People v. Martinez*, 83 P.3d 1174, 1179 (Colo. App.2003). Accordingly, we will not disturb a trial court's evidentiary rulings unless they are manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 53 Where a defendant contemporaneously objects to the admission of evidence at trial, we review the contentions on appeal for harmless error. *Yusem v. People*, 210 P.3d 458, 469–70 (Colo.2009); *Miller*, 113 P.3d at 749. An error is harmless if it does not affect the substantial rights of the defendant. *Salcedo v. People*, 999 P.2d 833, 841 (Colo.2000) (citing Crim. P. 52(a)). Where, as here, the error is not of constitutional dimension, the error will be disregarded as harmless if there is not a reasonable probability that the error contributed to the defendant's conviction. *Id.* "The proper inquiry in determining a harmless error question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings." *Id.* (quoting *Tevlin v. People*, 715 P.2d 338, 342 (Colo.1986)); *see also DeBella v. People*, 233 P.3d 664, 667 (Colo.2010).

¶ 54 However, where a defendant does not object to the admission of evidence at trial, or where a defendant objects on grounds different from those he or she argues on appeal, we review the defendant's contentions on appeal for plain error. *Moore v. People*, 925 P.2d 264, 268 (Colo.1996). Plain error is "an error that is obvious, substantial, and grave, seriously affecting the substantial rights of the accused." *Id.* at 268–69. Plain error requires reversal if, after a review of the entire record, a court can conclude with fair assurance that the error so undermined the fundamental fairness of the trial itself as to cast serious doubt on the

reliability of the conviction. *Boykins,* 140 P.3d at 95.

## B. Analysis

■ ¶ 55 At the outset, we note that defendant provides us with a list of "examples" in his opening brief of alleged improper questioning by the prosecutor. To the extent defendant implicitly suggests that we comb the record for other examples, we decline to do so and instead presume that the examples in defendant's brief constitute an exclusive, rather than an illustrative, list. *See* C.A.R. 28(k); *Castillo v. Koppes–Conway,* 148 P.3d 289, 291 (Colo.App.2006). Accordingly, we limit our analysis to those examples listed in defendant's brief.

¶ 56 Here, defendant's list of alleged improper questioning falls into three groups: (1) questions about defendant's interest in three-way sex; (2) questions about some of defendant's prior sex acts; and (3) questions about defendant's employment history. For the following reasons, we conclude that the trial court did not reversibly err in permitting the prosecutor to ask defendant any of the questions in these three groups.

¶ 57 First, defendant contends that the trial court erred in permitting the prosecutor to ask him about his interest in three-way sex. Specifically, defendant points to several questions where the prosecutor asked him about information he had posted on his Adult Friend Finder profile:

- "Sir, when you were using this profile to look for sex, were you looking for quote, women, couples, men and women, groups, couples, two women, group sex, three or more?"
- "Were you looking for sex in a car, hotel, anywhere?"
- "Were you looking for threesomes?"
- "Sir, if you look at your profile ... it certainly appears to me that you have an intense interest in ménage a trois or threesomes?"
- "Sir, directing your attention to the bottom of [your profile], do you like porn movies with group sex?"

Defendant objected to these questions on relevancy grounds. The prosecutor argued that defendant's interest in three-way sex was relevant because defendant was seeking a similar sexual encounter in this instance. The court overruled defendant's objection.

■ ¶ 58 We perceive no abuse of discretion in the trial court's ruling. The prosecutor's questions concerned information about defendant's sexual interests that he posted on his Adult Friend Finder profile (which had already been admitted into evidence), not "prior bad acts" under CRE 404(b). The prosecutor's questions were relevant to refute defendant's theory of defense and show that defendant was using Adult Friend Finder to facilitate a three-way sexual encounter, not to conduct a secret undercover internet sting operation. *See* CRE 402. Moreover, the prosecutor's questions were not unduly prejudicial in light of defendant's theory of defense and the contested issues to be decided at trial. *See* CRE 403.

■ ¶ 59 Second, defendant contends that the trial court erred in permitting the prosecutor to ask him questions about some of his prior sex acts:

- "Sir, have you had a ménage a trois?"
- "Sir, have you, in fact, had sex with a fifteen-year-old girl?"
- "Sir, have you had sex with, quote, a few virgins?"

At trial, defendant objected to the ménage-a-trois question on relevance grounds. However, defendant did not object to the question about his having sex with a fifteen-year-old girl or the question about his having sex with a few virgins.

¶ 60 We perceive no abuse of discretion in allowing the prosecutor to ask these questions. The prosecutor's questions were relevant to refute defendant's theory of defense that he was conducting a secret undercover investigation. Moreover, the prosecutor's questions all concerned statements made by defendant that had already been admitted into evidence. Specifically, the trial court had already admitted defendant's Adult Friend Finder profile, the instant message conversations, and the recorded phone calls, in which defendant acknowledged having a ménage a trois, having sex with a fifteen-year-old girl, and having sex with a "few

virgins," respectively. The trial court previously admitted these pieces of evidence over defendant's foundation objection, a ruling defendant does not challenge on appeal.

 ¶ 61 Third, defendant contends that the trial court erred in permitting the prosecutor to ask him questions about his employment history. As one example, defendant refers us to this colloquy:

[Prosecutor]: Sir, you were with law enforcement for a long period of time. But how is it that you came to leave the Pueblo sheriff's department?

[Defendant]: I was terminated.

[Prosecutor]: For what, Sir?

[Defendant]: I was living with a woman, she had two children, and I spanked her daughter on the butt one time.

Defendant also refers us to two other instances where the prosecutor asked defendant about his leaving the Calhan police department and about his disciplinary history while working at UCCS. At trial, defendant objected to these questions as eliciting improper character evidence. The prosecutor argued that defendant had opened the door to such evidence. The court overruled defendant's objection, finding that defendant had asked similar questions of his own witnesses on direct examination.

 ¶ 62 Again, we perceive no abuse of discretion. Regarding defendant's employment history, we agree with the trial court that defense counsel opened the door to such questions by asking other UCCS police officers as well as defendant questions about his employment history. *See Golob v. People,* 180 P.3d 1006, 1012 (Colo.2008). Regarding defendant's disciplinary history with UCCS, the prosecutor's questions were relevant to refute defendant's theory of defense and instead tended to establish that defendant was passed over for promotion because he was an inept police officer, not for "unfair" reasons. *See* CRE 402. Moreover, the prosecutor's questions were not unduly prejudicial, given that defendant's theory of defense put his employment history at issue. *See* CRE 403.

 ¶ 63 In any event, to the extent there was error here, it was either harmless or did not rise to the level of plain error. The prosecutor did not mention defendant's statements about having sex with a fifteen-year-old girl or a "few virgins" during closing argument. By contrast, defense counsel mentioned defendant's employment history during closing argument to further contend that defendant's actions were motivated by a desire to get promoted, not to have sex with Karina and Shayla. Moreover, viewing the record as a whole, including defendant's profile, the sexually explicit instant message conversations, and the recorded phone calls, we view the evidence of defendant's guilt as overwhelming, such that any alleged errors were either harmless, *Salcedo,* 999 P.2d at 841, or did not so undermine the fundamental fairness of the trial itself as to cast serious doubt as to the reliability of the conviction, *Boykins,* 140 P.3d at 95.

¶ 64 Accordingly, we conclude there was no error, let alone reversible error, in the prosecutor's questions eliciting the challenged testimony.

¶ 65 The judgment is affirmed.

Judge BERNARD and Judge LICHTENSTEIN concur.